UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
        v.                      )        Criminal No. 24-cr-10280
                                )
MIGUEL SARAVIA,          )
                                )
        Defendant               )
_____)

**GOVERNMENT'S SENTENCING MEMORANDUM**

For over five years, defendant Miguel Saravia perpetuated a fraud on health care benefit programs, including Medicare, MassHealth, and private insurance companies, by directing false billing for patient psychotherapy visits.  Over the course of the scheme, he directed individuals who worked for him to bill health care benefit programs—not based on what the doctors who worked for the behavioral health practices did, or care the patients received, but based on what he thought he could get away with.

For his actions, the government recommends that the Court impose a sentence of 12 months and a day of imprisonment, 12 months of supervised release, a mandatory special assessment of $600, restitution of $557,165.50 and forfeiture in the same amount.[1]  The recommended sentence is sufficient but not greater than necessary to achieve the purposes of sentencing set forth in § 3553(a).

## I.     Background

The factual background is set forth more fully in the PSR.  The defendant was the Chief Executive Officer of Maron DGA, P.C. d/b/a Dana Group Associates (collectively, "Dana"), a

---

[1] The plea agreement references a restitution figure that is $20,000 higher.  The government determined that its restitution calculation contained an error, and the updated reduced total is reflected here.

behavioral health practice that provided psychotherapy, psychopharmacology, and neuropsychological testing to adults, adolescents, and children in Needham, Massachusetts. PSR at ¶ 8. Its staff consisted of psychologists, licensed mental health counselors, licensed social workers, nurse practitioners, and psychiatrists. *Id.* The defendant was also the Chief Operating Officer at Nova Psychiatric Services, P.C. (NOVA), d/b/a Prime Behavioral Health (collectively, "Nova"), a provider of psychiatric and behavioral health services to patients in its offices in Quincy and Weymouth, and in hospitals, assisted living facilities, and nursing homes. Specifically, Dana leased employees to Nova to provide health services in nursing homes. *Id.* at 9. Nova's staff consisted of clinical nurse specialists, licensed social workers, nurse practitioners, psychologists, psychiatrists, and licensed mental health counselors. *Id.* Nova and Dana had clinicians who could prescribe medications, monitor patient use, and adjust dosing of medications. Clinicians met with patients at regularly scheduled intervals to conduct medication management visits, for which they billed payors using evaluation and management ("E&M") Current Procedural Technology ("CPT") codes. *Id.* at ¶ 13. Psychotherapy was also documented using CPT codes. *Id.* During their medication management visits, prescribers could provide psychotherapy but were not required to. *Id.* Medicare required that E&M visits were coded and billed based on the elements of the history, exam, and medical decision-making required by the complexity and intensity of the patient's condition. PSR, at ¶ 14.

From in or about January 2017 through in or about April 2022, the defendant engaged in a scheme to defraud health care benefit programs by directing false billing for patient visits. *Id.* at ¶ 21. To carry out the scheme, he directed a group of "billers"—individuals with no billing or medical training, who did not work with the billing department at either Nova or Dana and who did not have contact with medical providers at Nova or Dana in advance of entering the codes—

to enter CPT codes for therapy services that were not provided and to "upcode" CPT codes used for psychotherapy visits. *Id.* at ¶ 22. Most of the billers were personal friends or relatives of the defendant and lived abroad. *Id.* Among other methodologies, Saravia used WhatsApp to provide the billers with directions about what codes to use. *Id.* When clinicians complained about the use of unsupported add-on codes, Saravia directed billers to stop adding codes for that clinician. *Id.* Although the extent to which the defendant personally profited from this fraud (aside from the salary he derived) is unclear, Nova and Dana clearly financially benefited from the scheme.[2]

## II.    The Applicable Sentencing Guidelines

The parties agree the total offense level is 17, resulting in a Guidelines Sentencing Range of 24-30 months. The defendant's base offense level is six, because the offense has a statutory maximum term of imprisonment of less than 20 years. USSG §2B1.1(a)(2)). The defendant's offense level is increased by 14, because the loss the defendant caused was more than $550,000 and less than $1,500,000 (USSG §2B1.1(b)(1)(H)), and by an additional two levels, because the defendant's offense involved ten or more victims (USSG §2B1.1(b)(2)).[3] The defendant's offense level is then decreased by two because he meets the criteria set forth in USSG §4C1.1(a) and decreased again by three because he has accepted responsibility for his actions. The defendant has no criminal history.

## III.    The § 3553(a) Factors Support an Incarcerative Sentence

### A.  Nature and Circumstances of the Offense

The length and scope of the scheme makes clear that defendant's conduct was not the result

---

[2] If the case had proceeded to trial, the government would have worked with a forensic accountant to analyze the numerous accounts and voluminous transactions. Due to the defendant's prompt acceptance of responsibility, that analysis was not performed.

[3] Victims include Medicare, Aetna, Blue Cross Blue Shield, Mass Health, Optum, Point 32, United Health Care, AARP, Boston Medical Center, Commonwealth Care Alliance, Fallon Community Health Plan, Navicare, Senior Whole Health, and Wellcare.

of a single lapse in judgment, but rather was deliberate, calculated, and extensive. It is also noteworthy that the defendant was not content to engage in the upcoding and false billing himself. By virtue of his position, he directed other unwitting individuals, including friends and relatives overseas, to do his work for him. Because of the defendant's position, he also knew that clinicians raised issues with respect to their billings and that patients complained to Nova and Dana. Regardless, the defendant forged ahead, directing his back-room billers to take steps to avoid improper coding practices with the clinicians that complained—taking steps to hide what he was doing.

**B.  History and Characteristics of the Defendant**

Information provided to the government by defense counsel, as generally set forth in the PSR, reflects well on the defendant's personal characteristics. It is clear that the defendant is dedicated to his family and that he has otherwise lived a law-abiding life.[4] That must be considered at sentencing. But unlike many defendants that come before this Court, this defendant received a higher education, and even a degree in health care management. He could have continued to make a good living and be a role model to his children without engaging in criminal activity. Instead, he put everything at risk by engaging in fraud.

**C.  Specific and General Deterrence**

Both specific and general deterrence weigh in favor of an incarcerative sentence. *See* 18 U.S.C. § 3553(a)(2)(B), (C) (the district court may impose a sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant"). The defendant must understand that he cannot engage in fraud without consequences. Even

---

[4] The government acknowledges the defendant has multiple minor dependents, as do the majority of defendants that appear before the court, and notes that his children in the United States only came to live with him full-time in October 2024. PSR, at ¶ 76.

4

assuming this defendant will not be tempted to commit another crime—general deterrence is still a concern.  Here, it is the primary driver of the government's sentencing recommendation.  Health care fraud and abuse cost taxpayers billions annually and undermines both the cost and quality of health care provided to American patients.  The Department of Health and Human Services estimates over $100 billion in improper payments in Medicare and Medicaid in fiscal year 2023 alone.[5]  Adequately punishing health care fraud offenses like this one will help to protect the integrity of our nation's health care system and the enormous, yet ultimately finite, resources we devote to it.  An incarcerative sentence will send a message to others who have committed or are thinking of committing health care fraud that if they are caught and are found guilty in federal court, they will face real punishment.

### D.  Need to Avoid Unwanted Sentencing Disparities

There is also a need to avoid unwanted sentencing disparities.  Of course, there are limitations to case-based comparisons based on the specific facts of each case.  This case is no exception.  Another upcoding case recently prosecuted in this district bears distinguishing factors.  *See United States v. Oladipo*, 22-cr-10062-ADB (defendant convicted of health care fraud at trial based on false billings and upcoding of patient visits, defendant ensured flow of patients to his practice by prescribing highly-addictive opioids, sentenced to 16 months incarceration).  *United States v. MacEachron* is somewhat comparable.  *See United States v. MacEachron*, 24-cr-10193-IT.  The defendant pled to an Information alleging that he caused insurance companies and TRICARE to reimburse his company for physical therapy services that were not actually performed by editing claim forms to add units of service beyond those actually performed.  The government recommended 14 months incarceration and 24 months of supervised release.  He was

---

[5] *Medicare and Medicaid: Additional Actions Needed to Enhance Program Integrity and Save Billions*, https://www.gao.gov/products/gao-24-107487 (last visited March 20, 2025).

sentenced to three months incarceration, followed by 27 months of supervised release. The government's recommendation here will not result in unwarranted sentencing disparities, and it represents a fifty percent departure from the low end of the guidelines.

## CONCLUSION

For all the reasons set forth herein and to be discussed further at the sentencing hearing, the government's recommended sentence appropriately reflects the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    */s/ Mackenzie A. Queenin*
KELLY B. LAWRENCE
LINDSAY ROSS
STEVEN SHAROBEM
MACKENZIE A. QUEENIN
Assistant United States Attorneys

## Certificate of Service

I hereby certify that this document was filed through the ECF system on March 21, 2025 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:    */s/ Mackenzie A. Queenin*
MACKENZIE A. QUEENIN
Assistant United States Attorney