UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Case No.: 1:24-cr-10280 |
| MIGUEL SARAVIA, | |
| Defendant. | |

## DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES Defendant Miguel Saravia, by and through undersigned counsel, having pleaded guilty to Counts One through Six of the Information (ECF No. 1), and files this Sentencing Memorandum, which respectfully requests that this Court impose a sentence of 6 months home confinement followed by a period of probation and restitution.  In further support thereof, Mr. Saravia states as follows:

## INTRODUCTION

Mr. Saravia comes before this Honorable Court wholly contrite and unconditionally accepting full responsibility for his wrongful actions that led to this sentencing hearing. He understands that his actions require consequences under the law and pursuant to principles of fairness. He offers the following facts and circumstances to supply a factual basis for the sentence he requests and to provide context that is relevant to the statutory factors enumerated in 18 U.S.C. § 3553(a).

Mr. Saravia is a doting and dedicated father, a supportive and faithful son, an active member of his community, and a strong advocate for mental health services, and specifically accessible mental health services for the most vulnerable. He has spent the last twenty years pursuing employment, education, and developing and offering clinical services in furtherance of

1

that mission. He is the lifeblood of his family and his business, Dana Behavioral Health ("DBH"), which provides mental health services to vulnerable patient populations throughout the District. He is highly regarded by those who know him, including the 56 individuals that submitted character references in support of this Memorandum, attached hereto as Exhibit A. These letters speak of a person who is hardworking and kind.  Mr. Saravia is generous with his time and his spirit, supporting not only his immediate and extended family, but his friends and colleagues as well.  Mr. Saravia has no criminal history in either the United States or his birth country of Peru and has never been accused, outside of the instant proceedings, of a crime of dishonesty. Indeed, Mr. Saravia's actions that led to this criminal matter are wholly inconsistent with the way he has lived his life and treated others during his 42 years.

Mindful of the sentencing factors outlined in 18 U.S.C. §3553(a), Mr. Saravia respectfully requests that this Court take into account:

- the remedial measures he has undertaken (*see*, Section I(E) of this Memorandum) to both atone for and correct the harm he has caused;

- the community's support and endorsement of Mr. Saravia as evidenced by the character references attached hereto as Exhibit A;

- Mr. Saravia's criminal history level of I;

- the severe hardship that will befall Mr. Saravia's family, especially his minor children, if he is incarcerated (*see* Section D of this Memorandum);

- the precedent in this Circuit that supports significant deviation from the Sentencing Guidelines Range (*see* Section III(E) of this Memorandum);

- that Mr. Saravia is being held solely responsible for the billing practices described in the Information despite active participation in these practices by others,

including the owner of Nova Psychiatric Services, P.C. ("Nova"), who likely profited from the scheme (*see* Section I(B) of this Memorandum);

- Mr. Saravia's active participation in the underlying investigation, cooperation with the Government throughout, and his offer to serve as a resource to assist the Government in its investigation of the billing practices at issue (*see*, Section I(E) of this Memorandum),

and, in consideration of these facts and circumstances described in more detail below, determine that a sentence of 6 months home confinement followed by a period of probation and restitution is appropriate in this case.

I.    **<u>Background</u>**

A. <u>Miguel Saravia</u>

Mr. Saravia comes from humble origins. Born in Cusco, Peru, Mr. Saravia is the youngest of 5 children. Mr. Saravia finished high school at the age of 16. He gained acceptance to medical school in Peru, where he studied for 2 years.

Determined to provide a better life for himself and his family and to further advance his medical career, Mr. Saravia immigrated to the United States in 2001 when he was eighteen years old. He moved to Boston and sought gainful employment at various nursing homes and hospitals (including Hebrew Rehab Center, Carney Hospital, and Norwood Hospital), working overnights and weekends so that he could not only support himself, but his parents and family in Peru. Within two years of his arrival, Mr. Saravia obtained an associate's degree from Quincy College, where he also studied English as a Second Language ("ESL"). He pursued further education in Health Information at Labouré College and obtained a bachelor's degree from Northeastern

University in Healthcare Management.  Mr. Saravia attended school at night, working multiple jobs during the day.  He became a naturalized citizen of the United States in 2014.

      B.   <u>Nova Psychiatric Services, P.C.</u>

In or around 2004, Mr. Saravia met Dr. Alexandra Accardi while working as an intake coordinator at Carney Hospital.  Dr. Accardi took interest in Mr. Saravia and began mentoring him.  She offered Mr. Saravia a job at Nova less than one year later, as a billing and appeals specialist, even though Mr. Saravia was not certified in medical billing and coding.  Despite not being certified, Mr. Saravia did not receive any training to prepare him for this role.  He learned by way of the instructions provided to him by Dr. Accardi.  In 2006, Dr. Accardi promoted Mr. Saravia to the role of billing specialist. Mr. Saravia received this promotion despite having no background in medical coding and not being certified in medical billing and coding.  Mr. Saravia learned "how" to bill exclusively through the practices at Nova, which were replete with billing fraud, and the instructions he received from Dr. Accardi.

At the time Mr. Saravia joined Nova, Nova had an existing practice of overbilling. It was common for some clinicians, including Dr. Accardi, to book patients in fifteen-minute increments, often with patients double booked.  This resulted in clinicians visiting with and treating patients for fifteen minutes or less.  Nova billed for these encounters, however, using codes appropriate for appointments of either greater complexity or time. This practice frequently resulted in daily billing totals that exceeded the time the billing provider was in clinic treating patients.  If Dr. Accardi determined a provider was "underbilling" against company practice or

her expectations, she spoke with the provider directly or ask someone in the billing department, including Mr. Saravia, to retroactively change the provider's bill to increase profitability.[1]

In 2013, Mr. Saravia, due to the culture and his concerns with the standard of care at Nova, gave his notice. Dr. Accardi offered Mr. Saravia a promotion, suggesting his new position as a Patient Account Manager would provide him more autonomy. Mr. Saravia accepted the position, which did not come with a salary increase. Later, Dr. Accardi promoted Mr. Saravia to COO in 2015 and CEO in 2020. Mr. Saravia received a salary increase in 2019, 4 years after he became COO, from $78,000 to $120,000, but no changes in responsibility accompanied the title change. He did not receive a salary increase or equity share in the company when he became CEO.

Further, while Mr. Saravia received salary increases with his promotion to COO at Nova, his compensation (i) was never tied to or supplemented by the profitability of the company; and (ii) never exceeded $120,000, even when he was promoted to CEO. Although Mr. Saravia unconditionally accepts responsibility for his wrongful actions, he respectfully submits that these circumstances are relevant to sentencing given that, as discussed further below, the loss amount is a central driver of the Sentencing Guidelines Range in this case.

C.    Maron DGA, P.C.

In 2015, Mr. Saravia purchased Maron DGA, P.C. ("Dana"), a small mental health clinic offering therapy services to approximately 70 patients. Mr. Saravia proceeded with the transaction as it provided him with the opportunity to create the behavioral health practice he could not at Nova. He created a leadership team to share responsibility and oversight of the practice, initiated mandatory clinical supervision for all clinicians, declined to take Suboxone

---

[1] In retrospect, Mr. Saravia believes he was hired to work at Nova – without proper certification or training – so that he would unknowingly facilitate the existing fraud.

patients, only hired clinicians that agreed to see all patient populations, invested in his clinician's continued education through sponsorship of specialized training, and discouraged flat fee for service compensation for providers to disincentivize profit-based billing. Consistent with Dana's mission of providing accessible, diverse, and exceptional care, Mr. Saravia created a program to support veterans in need of mental health services, an early childhood program for children on the autism spectrum, and a telehealth program to ensure patients across Massachusetts could access mental health services. Dana has grown to include 123 employees and 89 providers across three locations. The practice currently serves approximately 14,257 patients from across Massachusetts. Mr. Saravia hired and contracted with individuals to work in Dana's billing department that reminded him of himself (i.e., hardworking, foreign born, self-starters looking for quality work in the health care space), to whom Mr. Saravia wanted to provide their "start." Mr. Saravia did not require these billers to be certified in medical billing and coding.[2]

Regrettably, at Dana, Mr. Saravia used similar improper billing practices to those he used at Nova despite complaints received by Mr. Saravia from certain providers informing Mr. Saravia that the bills adjusted by the billing department did not always match the services provided. As with all aspects of his wrongdoing in this case, Mr. Saravia fully takes responsibility for his wrongful conduct in this regard.

    D.   <u>Family Life</u>

Mr. Saravia has three biological children and is in the process of adopting a fourth child whom he considers to be his daughter. Two of his biological children, ages 11 and 7, live with

---

[2] The Government suggests Mr. Saravia targeted "unwitting" and untrained individuals and used them to carry out the billing scheme alleged. Mr. Saravia was hired to work as a billing specialist at Nova and worked at Nova in this capacity for many years, without any formal billing and coding training or certification in billing and coding. Mr. Saravia's personal history informed his hiring decisions, not an intend to defraud.

him at his home in Hanson, Massachusetts. The other two, ages 10 and 15, live in Peru with their mother.

Mr. Saravia married Sujeiry Saravia, on June 18, 2009. The couple had two children during their marriage. They divorced on November 19, 2018, due to irreconcilable differences but maintain a healthy personal and co-parenting relationship. Pursuant to the terms of his divorce decree, Mr. Saravia is responsible for providing the following support to his ex-wife and U.S. based children:

- Health, dental, and vision insurance coverage;

- The uninsured medical, dental, hospital, vision, and other health related expenses, co-payments, and deductibles for his children;

- The reasonable and medically necessary uninsured medical and dental related expenses, co-payments, and deductibles for his ex-wife;

- Expenses in the amount of $2,100 per month;

- All college expenses, defined to include all application fees, admission fees, testing fees, tutoring expenses, tuition, room and board, books, usual and normal student activity fees, laboratory and testing fees, the purchase of a personal computer and associated equipment, travel expenses incurred travelling to and from college and/or post-secondary school education, the costs associated with setting up a dorm, including bedding and the link, and all other expenses normally charged on college and/or university bills. Should a child live off-campus, education expenses are defined to include all costs of such a living arrangement, including rent, food, and utilities; and

- All living expenses for his ex-wife in the event she becomes disabled.

While Mr. Saravia's divorce decree capped his monthly expenses at $2,100, he regularly exceeds this amount in financial support. Prior to 2025, Mr. Saravia paid all expenses related to his children. Mr. Saravia now shares this responsibility with his ex-wife in part, who covers certain family-related expenses on an ad hoc basis. Mr. Saravia remains the primary source of financial support for his children in the United States.

In addition to financial support, Mr. Saravia is an active parent. His two children in the United States live with him full time in Hanson. He takes them to and from school every day and is responsible for all their after-school activities. Mr. Saravia brings his son to soccer practice, attends his soccer games on the weekends when he is not visiting his daughters in Peru, and practices soccer with his son almost every day. Mr. Saravia brings his daughter to gymnastics every Saturday. Mr. Saravia schedules and coordinates playdates for both his children, hosts sleepovers at his home, reviews each child's homework, and oversees their weekend chores. Mr. Saravia cooks and bakes with his children, prepares dinner with them, involves them in his charitable pursuits, reinforces the lessons they learn at their Catholic school at home, and prioritizes quality time together. For example, Mr. Saravia can often be found under a homemade tent reading books with his children, listening to them sing at home, or in the yard playing with his son. Mr. Saravia's parenting style is very structured. The children are accustomed to his supervision and parenting style and turn to him for support. If incarcerated, his absence will not only create a less stable environment but will also cause significant emotional distress to his children.

As it relates to his children outside of the United States, Mr. Saravia provides for all their expenses, including but not limited to health, education, extracurricular activities, English classes, and vacations. He pays the mortgage and utilities associated with the house in which his children

reside and covers all the living and medical expenses incurred by the mother of his soon-to-be adopted daughter, Patricia Sequeiros, which are not insignificant as she currently has no other source of income and is suffering from a brain tumor. Ms. Sequeiros may require surgery in the future to treat her condition, and when that occurs Mr. Saravia will be solely responsible for the wellbeing, care, and oversight of the two children who are currently in Peru.[3]

Mr. Saravia is an active paternal figure to his children who reside in Peru, and travels frequently to see them. Mr. Saravia recently applied for and was granted an immigrant visa for his biological daughter in Peru so that she may move to the United States, live with her brother and sister, and experience a better quality of life. It is Mr. Saravia's dream for all four of his children to live under the same roof. This dream is close to becoming a reality as the proceedings finalizing the adoption of his soon-to-be adopted daughter are scheduled to conclude no later than June 2025.[4]

In addition to financially supporting his children, ex-wife, and Ms. Sequeiros, Mr. Saravia also financially supports his parents, who live in his home nine months out of the year. When Mr. Saravia's parents reside in Peru, he provides a stipend to his father and mother to cover their basic needs. Mr. Saravia also covers all their medical expenses given their advanced age.

E. Cooperation with the Government

Since receiving the Government's administrative subpoena in June 2022, Mr. Saravia has actively participated in the investigation underlying this case. He produced hundreds of thousands

---

[3] Ms. Sequeiros' most recent MRI results show that the mass in her brain has grown. Due to the conditions of his release, Mr. Saravia has not been able to comfort his daughters in person. He has spent significant time in the last two weeks comforting his children by phone and discussing next steps with Ms. Sequeiros.

[4] According to Mr. Saravia's adoption counsel in Peru, Mr. Saravia must be physically present in the country at the time the adoption ruling is issued so that he can process the registration of is daughter.

of documents in response to the administrative subpoena, coordinated the participation of various Dana employees in the investigation, obtained or offered independent counsel to each Dana employee interviewed by the Government, and offered himself as a resource to the Government to assist the Government with their investigation of the billing practices at issue.

Mr. Saravia performed analyses of providers billing practices – and provided documents to the Government summarizing the same - which demonstrated certain providers scheduled patients in fifteen minute or less increments, regularly double-booked patients, and routinely overbilled for services – such that their daily totals sometimes exceeded the time the provider spent in clinic by multiple hours.  Mr. Saravia also highlighted internal meeting minutes and memoranda that were sent to others, including the owner of the company, that discussed the billing practices at issue.

Nevertheless, and for reasons unknown to Mr. Saravia, the Government decided not to pursue any other individuals or entities for their participation in the billing practices described in the Information, including Dr. Accardi.[5]

---

[5] On March 23, 2023, the Massachusetts Board of Medicine "indefinitely suspended the medical license of Dr. Alexandra L. Accardi after it found that Dr. Accardi committed misconduct in the practice of medicine and engaged in conduct that places into question her competence to practice medicine in failing to establish and maintain necessary physician-patient boundaries with a patient." *See* News Report, Massachusetts Board of Registration in Medicine, *Massachusetts Board of Medicine Takes Disciplinary Action – March 23,* 2023, March 23, 2023, https://www.mass.gov/news/massachusetts-board-of-medicine-takes-disciplinary-action-march-23-2023. The Board also voted to stay implementation of the suspension for ninety days, and in June 2023 the Board extended the stay an additional 90 days. On September 23, 2023, the suspension went into effect, but the Board stayed the suspension again on October 5, 2023. On December 7, 2023, the Board voted to indefinitely stay Dr. Accardi's license suspension. According to publicly available Board of Registration in Medicine (BORIM) Physician License Verification, the December 2023 indefinite stay of the suspension is the latest action that the Board has taken with respect to the suspension. *See* Commonwealth of Mass., Board of Registration in Medicine (BORIM) Physician License Verification, *last visited* Mar. 23, 2025, 6:32 P.M., *available at* https://findmydoctor.mass.gov/profiles/59573.

F.   Corrective Action

Mr. Saravia has taken significant steps since initially receiving the U.S. Attorney Office's administrative subpoena to change the billing practices described in the Information and then to remove himself from Nova.  First, Mr. Saravia stopped any changes to invoices and ultimately terminated his employment at Nova.  Second, he prohibited the billing team at Dana from making any changes to a provider's bill without the express knowledge and permission of the provider. Mr. Saravia initiated two annual employee trainings, including (i) one 2-hour employee coding and billing training seminar conducted by the current Medical Director and Clinical Director of Nursing; and (ii) a one-hour annual training by a certified American Health Information Management Association approved trainer, to ensure all staff members are educated and properly trained on billing best practices.  Mr. Saravia also created a Quality Assurance Manager position at Dana.  The Quality Assurance Manager is a clinician that is responsible for overseeing the clinical and billing practices of Dana's providers, and in conjunction with the Clinical Directors, makes recommendations for improvement. The Quality Assurance Manager also serves as a neutral liaison between the billing department, clinical staff, and clinical directors and conducts regular compliance audits to address billing issues, if any, as they arise.

More recently, Mr. Saravia participated in several health care fraud related trainings offered by the United States Department of Health and Human Services, including (1) Combatting Medicare Parts C & D Fraud, Waste, and Abuse; (2) Fraud, Waste, and Abuse for Health Care Providers, and (3) a health care fraud Compliance 101 seminar.  *See* Exhibit B, Health Care Fraud Training Certificates.

**ARGUMENT**

II.   **Legal Standard**

Although the Sentencing Guidelines are a relevant factor under 18 U.S.C. Section 3553, they are no longer mandatory. *United States v. Booker*, 543 U.S. 220 (2005) ("The provision of the federal sentencing statute that makes the United States Sentencing Guidelines mandatory. . . is incompatible with the United States Supreme Court's constitutional holding that the Sixth Amendment requires juries, not judges, to find facts relevant to sentencing. . . So modified, the Federal Sentencing Act. . . makes the Guidelines effectively advisory.  It requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well. . ."). Accordingly, "the range of choice dictated by the facts of the case is significantly broadened." *Gall v. United States*, 552 U.S. 38, 59 (2007).  A district court must now "consider all of the factors set forth in 18 U.S.C. §3553(a) to guide its discretion at sentencing." *Peugh v. United* States, 569 U.S. 530, 536 (2013).  "The *Booker* remedy, 'while not the system Congress enacted,' was designed to 'continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.'" *Id.* (quoting *Booker*, 543 U.S. at 264-65).

Pursuant to 18 U.S.C. § 3553(a)(2), the Court "shall impose a sentence sufficient, *but not greater than necessary to*. . . (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2) (emphasis added).

**III.**      **Application of the Sentencing Factors Outlined in 18 U.S.C. §3553(a) to the Facts of This Case Demonstrate Mr. Saravia is a Candidate for Home Confinement**

In crafting a sentence, the Court is obligated to take into account all factors under Section 3553, including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. §3553(a)(1-7).

The sentencing factors under 18 U.S.C. §3553 as applied to the facts of this case demonstrate that a sentence below the Sentencing Guidelines Range is appropriate on multiple grounds.

A. *Nature and Circumstances of the Offense*

Mr. Saravia acknowledges the seriousness of the offense of health care fraud and is truly sorry for the harm that he has caused by his own actions. He respectfully submits that the nature and circumstances of his particular offense in this case warrant a sentence below the Sentencing Guidelines Range, chiefly because – as mentioned in the factual recitation above and the analysis below – the Guidelines Range is driven principally from the loss amount in this case. Mr. Saravia's modest salary at Nova, his lack of equity in the company, and the fact that the improper billing in which he participated at Nova did not impact his pay, are circumstances that the Court should consider in fashioning a sentence. *See e.g.*, *United States v. Bruining*, No. 1:23-cr-00049-MSM-PAS-1 (D.R.I.), discussed in Section III(E), below.

B. *History and Characteristics of the Defendant*

Mr. Saravia has no criminal history. He actively participated in the investigation underlying this action, cooperated with the Government, and offered himself as a resource to assist the Government's investigation. Excluding the instant matter, he has lived an exemplary life. He is a dedicated father, a devoted son, an active member of his community,[6] and a quality businessman respected by his employees. These positive traits, among others, are repeatedly reflected in the 56 character references attached to this Memorandum as Exhibit A.

By way of example, Kaitlin Gaffney, a psychiatric nurse practitioner that has worked for Mr. Saravia for six years, describes him as "genuine, hardworking, honest, generous and caring" person. She notes that Mr. Saravia "has always allowed [Ms. Gaffney] and [her] colleagues to provide evidence-based care including providing medication management with supportive therapy to [her] patients." She states Mr. Saravia "never expected or pushed for patients to be seen on a rapid basis which would allow for a high volume of patients to be seen per day" commenting that "[m]ost employers in this field do require this at the cost of good quality patient care. This is something that [Ms. Gaffney] is not willing to sacrifice and thus why it was so important to [her] to find an employer like [Mr. Saraiva] who has the same values as [her]."

The character reference submitted by Sasheen Hazel, the Executive Clinical Director at Nova, provides that Mr. Saravia "recognized her potential early on and provided her with numerous opportunities to grow into a leadership position within the company. . . he supported [her] initiatives with neuropsychological testing and [an] internship training program, backed

---

[6] Mr. Saravia serves on the board of the AyP Business School, which is a charitable organization in Revere, Massachusetts, that offers comprehensive training and empowerment programs for youths to address issues of underemployment in the Latino community. Mr. Saravia also serves on the board of the Latina Center Maria whose mission is to empower Latino community members with no or limited English through education and entrepreneurship in the United States and Latin America.

[her] ideas for growing the psychotherapy team, and facilitated challenging conversations with colleagues in a way that fostered a more positive and collaborative work environment." While Ms. Hazel notes that sometimes she and Mr. Saravia disagreed, he was "always open to dialogue, and we consistently found common ground through mutual respect and a willingness to compromise." She notes Mr. Saravia's "commitment to the company and to his employees was unparalleled."

The sentiments expressed by Ms. Gaffney and Ms. Hazel are consistent with the character reference submitted by Adam Riccio, the former Clinical Director for the South Shore offices of Dana. According to Mr. Riccio, "the strongest character traits for Mr. Saravia revolves around his values and beliefs in humanity." Mr. Riccio notes that "throughout [his] time with DBH, Mr. Saravia would never let his team forget to value our overarching mission: delivering quality behavioral health care to all people. Mr. Saravia's belief in this was infectious and motivated many of [his employees] through difficult work and times." Mr. Riccio states that "Mr. Saravia was always respectful and never faltered in valuing the struggles of all people, at times taking financial hits to continue appropriate clinical work with an individual or family that struggled to afford services."

The character reference submitted by Mr. Saviel G. Colón, a friend and member of Mr. Saravia's community, is equally glowing but provides a slightly different perspective. As noted therein, Mr. Colón met Mr. Saravia in 2003 in church. Since that time Mr. Colón has "watched [Mr. Saravia] grow into a man whose character is marked by his strong faith, dedication to his family, and tireless commitment to his community." Mr. Colón explains that Mr. Saravia "came to this country from Peru with little more than his determination and a dream to build a better life." Describing the success of DBH, Mr. Colón notes that Mr. Saravia's "journey in the United

States is a true testament to his work ethic and determination," he comments, however, that Mr. Saravia's "success is not measured merely by numbers. It is in the compassion he shows to everyone around him, from his employees to his patients. His practice is built on a foundation of kindness and care, where each person is treated like family. This unique and nurturing environment is a direct reflection of [Mr. Saravia's] character – he is a man who puts the needs of others first." As a testament to Mr. Saravia's "deep commitment to serving others" Mr. Colón remarks that Mr. Saravia "was recently honored by the Peruvian Council for his outstanding contributions to the mental health community."

These representative samples, along with the additional character letters attached hereto, demonstrate that this action represents a marked deviation from an otherwise law-abiding life in which Mr. Saravia earned an excellent reputation. Mr. Saravia submits that the overwhelming evidence of his good character, when reviewed in tandem with the other sentencing factors in his favor under 18 U.S.C. §3553(a) justifies a sentence below the Sentencing Guidelines Range.

C. *The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

As someone deeply committed to serving vulnerable patient populations, Mr. Saravia is acutely aware that health care fraud impacts both the accessibility and affordability of quality health care. He is ashamed of his conduct. Mr. Saravia accepts his guilty plea and the fact that all its attendant consequences were brought about by his conduct. He has paid a steep price personally and financially thus far for his actions, and he will bear the heavy weight of his mistakes forever.

In weighing the seriousness of an offense, it is appropriate to assess the crime committed by reference to the impact on the victims. Assuredly, no one should be defrauded. It bears noting, however, that the Government has chosen to pursue Mr. Saravia only – even though his

compensation at Nova was never tied to the profitability of the company and it is likely that others - and not Mr. Saravia - profited from more than 90% of the billing practices at issue. The Government also seeks to hold Mr. Saravia liable for the full amount of the loss (which includes all amounts paid by the federal health care programs for the claims at issue), even though the Information recognizes that services were rendered on most claims at issue, for which Nova and Dana overbilled. Notwithstanding the foregoing, Mr. Saravia now bears full legal responsibility for all monies paid to Nova as a result of such billing practices, and the full amount of the corresponding loss was used to calculate his current offense level of 17. Indeed, in this case the loss amount is the most significant driver of the Sentencing Guidelines Range. Mr. Saravia submits, without devaluing the seriousness of his own actions, that a sentence below the Sentencing Guidelines Range is warranted on these facts to ensure a just punishment is imposed.

As for Mr. Saravia himself, there is no evidence outside of the offense conduct to sentence him for the purpose of "protect[ing] the public from further crimes of the defendant." 18 U.S.C. §3553(a)(2)(C). Mr. Saravia has never been accused of criminal conduct before. He is the primary supporter of his children and his parents, and he is in turn supported by a loving family and community who want to see him resurrect his career and reputation. Furthermore, Mr. Saravia has fully complied with all his pre-sentence release conditions and has committed no conduct that indicates a likelihood of re-offense.

D.  *Kinds of Sentences Available*

By applying the full amount of the loss attributable to Nova to Mr. Saravia, his current offense level is 17 which falls within Zone D of the Sentencing Guidelines – a range for which United States Sentencing Guideline ("USSG") Section 5C1.1 does not provide home confinement.

Nevertheless, and in full recognition of the terms of his plea agreement, Mr. Saravia respectfully submits that this Court should consider that, if one were to discount the loss amount attributable to Nova – the offense calculation would decrease by 10 points, and the offense level would be in in Zone A, carrying a corresponding Sentencing Guidelines Range of 0-6 months imprisonment.  The Guidelines in Zone A permit a sentence of a fine only, a sentence of probation (with or without a condition of community confinement or home detention), or a sentence of imprisonment to be imposed for offenses in Zone A.  Mr. Saravia moves that a sentence of some home confinement and probation is an appropriate result based on the unique facts and circumstances of this case.

Alternatively, Mr. Saravia asks this court to consider that the total loss claimed by the Government is only $7,165.51 above the $550,000.00 threshold set forth in USSG §2B1.1(b)(1)(H).  If Mr. Saravia's offense level was 15, he would be similarly situated to the defendant in *United States v. MacEachron*, 1:24-cv-10193-IT (D. Mass) – identified by the Government in its Sentencing Memorandum (ECF No. 25) as comparable to the instant case - wherein the defendant was sentenced to only three months incarceration, followed by 27 months of supervised release.

> E. *The Need to Avoid Unwarranted Sentence Disparities Between Similar Situated Defendants*

Mr. Saravia brings to this court's attention *United States v. Bruining*, No. 1:23-cr-00049-MSM-PAS-1 (D.R.I.), a case sentenced on March 5, 2025, within the First Circuit that imposed a sentence of home confinement on similar facts despite a $3.5 million loss to the Government. A summary of this matter is included below for the Court's consideration.

Defendant, Song Bruining, was a social worker that worked at Recovery Connections Centers of America ("RCCA"), an office-based opioid treatment program with multiple locations throughout Rhode Island. The owner and COO of RCCA, who was separately charged, was identified by the Government as a co-conspirator in the scheme described. The Information filed in Ms. Bruining's case alleged Ms. Bruining (i) billed Medicare, Medicaid, and other insurers for 45-minute appointments when she and other counselors only spent five-ten minutes or less with each patient; (ii) trained counselors to see patients for no more than 5-10 minutes despite knowing RCCA was billing all the counseling sessions as 45 minutes or more; (iii) directed counselors to record in their notes that they were providing counseling in 45 minute intervals, without listing an am or pm start time; (iv) booked patients for counseling at intervals so that counselors could see patients as quickly as possible (for as few as 3-10 minutes); and (v) at the request of RCCA owner, Michael Brier, retroactively edited patient records that did not reflect 45 minutes of counseling when being audited by BCBS Rhode Island to hide the fraudulent billing practices, among other improper acts. The Information further alleged that the claims submitted by RCCA routinely totaled more hours of service in one day than was possible for the counselors to complete, especially given the counselors only provided services between 4-6 hours a day. These fraudulent claims resulted in more than $3.5 million in fraudulent reimbursements to RCCA. *See*, Information, *United States v. Bruining*, attached hereto as Exhibit C.

Based on the amount of the loss, among other factors, Ms. Bruining's offense level was calculated at 21, which carries a 37 – 47-month prison sentence under the Guidelines. Nevertheless, the Government recommended the defendant be sentenced to 24 months of home confinement, with a requirement of 300 hours of community service, three years of supervised release, restitution in the amount of $3,515,100.00 and forfeiture of $3,515,100.00.   In its

sentencing memorandum (ECF No. 32), the Government advised that its sentencing recommendation "takes into account [the defendant's] lesser role in the offense in comparison to her boss, Michael Brier, and appropriately holds her accountable for her participation in such a significant mistreatment of patients."  The Government further advised that:

> "although. . . [the defendant] was led into these crimes by the mastermind, Michael Brier, he could not have carried out such a fraud at this scale without her complicity and carrying out his orders and implementing them throughout the organization.  Nor did she simply passively comply, she was instrumental in teaching and requiring others to deprive patients of their needed therapy and falsely document that therapy to cover it up. . . . ***It also takes into account that unlike Brier, Bruining did not [sic] receive a significant share of the proceeds but was paid only a modest salary***." (emphasis added)

*See* Gov't's Sentencing Memorandum, *United States v. Bruining*, attached hereto as Exhibit D. Departing from the Guidelines even further, the Court sentenced Ms. Bruining to time served, three years supervised release, $100,000.00 in restitution (joint and several), a $100.00 special assessment, and no fine. *See* Judgment, *United States v. Bruining*, attached hereto as Exhibit E. Mr. Saravia respectfully requests that this Court take a similar approach to the Court's sentencing decision in *Bruining* and impose a sentence of some home confinement and probation.

## CONCLUSION

For the reasons stated herein, and in any oral argument, Miguel Saravia, respectfully requests that the Court impose a sentence of home confinement in this case, which is sufficient but not greater than necessary to achieve the goals of sentencing.

Dated: March 21, 2025                    Respectfully submitted,

                                         /s/ Michael J. Sullivan
                                         Michael J. Sullivan
                                         Simon J. Cataldo

Nicole M. Levesque
Ashcroft Law Firm, LLC
200 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-9400
msullivan@ashcroftlawfirm.com
scataldo@ashcroftlawfirm.com
nlevesque@ashcroftlawfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on March 21, 2025, a true and correct copy of the foregoing Memorandum was served via the Court's CM/ECF system to all counsel of record.

<u>/s/ Michael J. Sullivan</u>
Michael J. Sullivan
