# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR NO. 23 CR00049-001 MSM-PAS |
| ) | |
| MI OK SONG BRUINING, ) | **FILED UNDER SEAL** |

## GOVERNMENT'S SENTENCING MEMORANDUM

Mi Ok Song Bruining ("Bruining") used her position as a social worker, a position of trust for patients who needed her help, to instead cheat those patients out of the treatment they deserved and needed, and all the while she knew that her company was billing for this treatment that it was not providing. Bruining was not just a mere participant in this fraud. She was the second-in-command. She trained others on how to execute the fraud. She manufactured paperwork to cover the fraud up. She was a vigorous proponent of the fraud and bragged about her own role as the "Five Minute Queen," who substituted one or two sentence conversations for the 45 minutes of therapy her addict patients were supposed to receive. She sometimes brought a patient into her office only to ask if they had used illicit drugs and then would tell them they could leave once the question was answered, regardless of the answer. PSR ¶ 16.

The government recommends Brier be sentenced to twenty-four months of home confinement, with a requirement of 300 hours of community service, three years of supervised release, restitution in the amount of $3,515,100, and forfeiture of $3,515,100. This sentence both takes into account Bruining's lesser role in the offense in comparison to her boss, Michael Brier, and appropriately holds her accountable for her participation in such a significant mistreatment of patients.

## FACTUAL SUMMARY

On November 13, 2023, pursuant to a plea agreement, Bruining pleaded guilty to one

count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

A. PSR

The following are the facts set forth in the Presentence Investigation Report, as to which there is no objection.

Defendant Mi Ok Song Bruining was an independent clinical social worker, licensed by the state of Rhode Island since April 26, 2018. Since she obtained her license, Bruining worked at Recovery Connection Centers of America, Inc. ("RCCA"). RCCA operated as an office-based opioid treatment program, providing treatment for opioid addiction at locations in Rhode Island and Massachusetts, including in ProvidenceI. RCCA had been enrolled in Medicare since April 16, 2018; Bruining was also enrolled in Medicare and reassigned her Medicare payments to RCCA while she worked there. PSR ¶ 10.

From about April 2018 through July 2022, in the District of Rhode Island and elsewhere, Bruining, together with Michael Brier, RCCA, and others, knowingly and willfully agreed to execute a scheme to defraud health care benefit programs affecting interstate commerce. Those programs included Medicare, Rhode Island Medicaid, and other programs listed in the Information. Bruining and her co-conspirators made money by submitting false and fraudulent claims to these programs. PSR ¶ 11.

Specifically, Bruining and her co-conspirators knowingly and willfully caused false and fraudulent claims for psychotherapy and counseling services that did not occur for the length of time billed to be submitted to Medicare, Medicaid, and other insurers. On many occasions, Bruining caused RCCA to submit false and fraudulent reimbursement claims for counseling sessions that were supposed to last 45 minutes. Together, these claims reflected sessions that added up to many more hours than would have been possible for counsellors to complete. These

fraudulent claims resulted in more than $3.5 million in fraudulent reimbursements to RCCA. PSR ¶ 12.

Bruining caused RCCA to consistently bill for far more patients in the Providence location during office hours than would have been possible. For example, on Thursdays, the maximum number of patients that could be seen for 45 minutes of counseling between the available hours at RCCA of 11 a.m. and 7 p.m. was 11. On many Thursdays during the conspiracy, RCCA billed for 45-minute counselling sessions for significantly more than 11 patients. PSR ¶ 13.

Bruining also trained the RCCA counselors to see patients for no more than 5-10 minutes, despite knowing that RCCA was billing all the counseling sessions as 45 minutes or more. To facilitate this fraud, Bruining directed counselors and others at RCCA to record in their notes that they were providing counseling in 45-minute intervals, but without listing AM or PM for the start time. Bruining instructed the counselors not to record whether the start time for their visit was AM or PM so that it was *not* clear that they were seeing more patients than possible within a single hour. She also instructed other counselors to copy and paste the last visit's note into each entry to make the bill look complete. As a result, many of the patient notes for patients billed by RCCA are simply identical cut-and paste copies of the same note. PSR ¶ 14.

Bruining also booked patients for counseling at a pace that would not allow counselors to see patients for more than a few minutes, and trained counselors to see patients as quickly as possible, for as few as 3-10 minutes. Bruining further instructed RCCA counselors when they were hired that they must document client counseling sessions for 45 minutes, regardless of the time actually spent. PSR ¶ 15.

3

Bruining herself sometimes only brought a patient into her office to ask if they had used illicit drugs and then would then tell them they could leave once the question was answered, regardless of the answer. Bruining usually only checked with her patients briefly to see if they relapsed and—if the patient seemed in good health—then the counseling appointment would be short, which Bruining referred to as a "drive by." Some patients did not even sit down during their visits because the counseling sessions were so brief. Bruining also bragged to the other RCCA counselors and staff about seeing so many patients in one day and about how productive she was. She was known around the office as the "5 Minute Queen" for her speed in seeing patients for so-called counseling sessions. PSR ¶ 16.

In its billings to Medicare and various private payors for the period of about January 1, 2018, to February 14, 2023, RCCA billed using a code that represented psychotherapy treatment for 45 minutes with a patient, more than 53,000 times. Almost all therapy sessions billed at RCCA were billed using this code, meant to represent an average of 45 minutes – and no less than 38 minutes – of therapy rendered to the individual patients, despite the fact that therapy was not being provided for more than fifteen minutes. PSR ¶ 17.

On November 8 and 9, 2019, Bruining engaged in an email exchange with co-conspirator Michael Brier and a then-RCCA staff person, in which Bruining directed the RCCA staff person to continue to see patients for only about 15 minutes as scheduled, even though they were billing the counselling sessions as if they had lasted 45 minutes. PSR ¶ 18.

In 2020, when RCCA was being audited by an insurance company, and the auditors requested counseling notes for various patients, Bruining, pursuant to instructions from Michael Brier, changed the patient counseling note to falsely reflect that the patient was seen for 45 minutes so that the medical record matched what was billed to the insurer, despite the fact that no

4

patients at RCCA were seen for 45 minutes. To do this, Bruining created a copy of her counseling notes that were separate from those in Practice Fusion, the electronic health record system used by RCCA, and added the end time to each note that was being provided to the insurer. In other words, if a patient's record already had a start time of 9 am, Bruining edited the record to reflect that the patient was seen by a counselor from 9:00-9:45 am. These edited records were then printed by Bruining and sent to the insurer. Bruining then deleted her copy of the edited records. PSR ¶ 19.

In total, it was reasonably foreseeable to Bruining that her conspiracy to commit health care fraud caused a loss of more than $3.5 million. Bruining's conduct, a Federal health care offense, also resulted in a loss to a government health care program of more than $1 million. PSR ¶ 20.

B. Guidelines Calculation

The government submits that the defendant's total "offense level" under the Guidelines is level 29. This is calculated as follows:

| | | |
|---|---|---|
| Base offense level | 6 | § 2B1.1(a) |
| Losses from the offenses more than $3,500,000 but not more than $9,500,000 | +18 | § 2B1.1(b)(1)(G) |
| Federal Health Care Fraud Offense | +2 | § 2B1.1(b)(7)(A), (B)(b)(1) |
| Zero Point Offender | -2 | § 4C1.1 |
| Acceptance of responsibility | <u>-3</u> | § 3E1.1 |
| **Total offense level:** | **21 (37-47 months)** | |

III. SENTENCING RECOMMENDATION

The United States submits that a sentence of twenty-four months home confinement is warranted to appropriately punish the conduct in this case and deter others from participating in

similar conduct. The sentence is justified not only by the defendant's significant participation in the health care fraud in this case, but also her training of others, insistence that they participate, and participation in the falsification of documents to cover up the crimes.

Although on the one hand Bruining was led into these crimes by the mastermind, Michael Brier, he could not have carried out such a fraud at this scale without her complicity and carrying out his orders and implementing them throughout the organization. Nor did she simply passively comply, she was instrumental in teaching and requiring others to deprive patients of their needed therapy and falsely document that therapy to cover it up.

Nor was she reticent about her misconduct. She bragged to others that she was the "Five Minute Queen" because she provided therapy so fast it was as if she was at a drive-through window. She did not even let her clients sit down, and she told others to emulate her. Given her training and education and role as a social worker, this total perversion of her role to care for her clients warrants a strong message. There is no telling whether any of her patients failed to recover from addiction or relapsed and even overdosed due to her lack of treatment, but that is the risk she embraced and the conduct about which she bragged.

The United States recommendation of 24 months home confinement seeks to balance the recognition that she acted at the direction of Brier, and the fact that the medical professionals who work in health care are and must be held responsible for their care of patients as well as proper billing. It also takes into account that unlike Brier, Bruining did not make receive a significant share of the proceeds but was paid only a modest salary. By requiring her to perform a significant amount of community service while she is on home confinement, perhaps she can begin to repay some of the harm she has done through her serious crimes in this case.

A. <u>Nature, Circumstances, and Seriousness of the Offenses</u>

Bruining participated in an extensive scheme to defraud the government and other health insurers, and the patients who came to the RCCA clinics, by causing RCCA to charge for required addiction treatment services they did not, in fact, provide. Bruining herself did not take the time to provide therapy to this underserved population and ran the clinic so that the other therapists also did not have time or opportunity to do so.

B. <u>History and Characteristics of the Defendant</u>

This defendant has a complicated and varied history. Her childhood involved both substantial challenges and the good fortune to be adopted into a loving family. She does not have any history of other criminal conduct and appears to have otherwise led a law-abiding and positive life. The United States has considered these factors in coming to its recommendation of home confinement.

C. <u>The Need for Specific Deterrence</u>

Bruining, unlike Brier, has no history of non-compliance or other illegal activity and confessed to her role in the activity as soon as she was questioned by federal agents. Thus, the United States has fashioned its recommendation to reflect the apparent low risk that she will reoffend after this experience.

D. <u>Need to Promote Respect for the Law and Just Punishment and General Deterrence</u>

The United States submits that deterrence of others is an important factor in sentencing Bruining. These kinds of large-scale corporate fraud can only be accomplished when the leaders are able to coopt others into their fraud. It is critical that health care professionals such as Bruining understand that they, too, will be held accountable if they participate in such misconduct, deprivation of services to clients, betrayal of clients and fraud upon the health care

7

system or other government programs.  When staff such as Bruining end up in a situation where they are being asked to cheat patients or defraud payors, they must be held accountable if they choose to join and actively promote such conduct, even if they did not begin it or profit much from it.

Fraudulent procurement of such benefits both erodes public trust in the programs and stresses the system's ability to efficiently deliver benefits to vulnerable people.  It is important to make clear that such extensive attempts to abuse the programs and resources available to help those suffering from addiction turn their lives around will result in significant consequences.  Such a message is critical to deter others who may see such programs as an easy target.

E. <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct</u>

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished.  *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which*

*They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).  The recommended sentence is also consistent with the need to avoid unwarranted disparities in sentences.

Although the United States' recommendation is substantially different from that for Brier, Bruining is not similarly situated to Brier.  He was the mastermind and leader and received the profits from the crimes.  He directed her what to do – and she, to her discredit, did it.

Brier has an extensive history of prior criminal conduct and other frauds and deceit, throughout his lifetime, and Bruining does not.

Bruining confessed to her role immediately – before any charges were brought – and he did not.  And Brier instead took steps to obstruct the investigation, including trying to threaten others not to cooperate.

Thus, the United States submits there is no undue disparity between the recommended sentence for Bruining and that for Brier.  To the contrary, the substantial differences in their backgrounds, roles in the offenses, profits, and response to this investigation all support such different recommendations.

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of 24 months of home confinement, with a special condition of 300 hours of community service, three years of supervised release, restitution in the amount of $3,515,100, and forfeiture order of $3,515,100.

Respectfully submitted,

ZACHARY A. CUNHA
United States Attorney

By:  */s/ Sara Miron Bloom*
SARA MIRON BLOOM
KEVIN LOVE HUBBARD
Assistant United States Attorneys
U.S. Attorney's Office
One Financial Plaza, 17th Floor
Providence, RI
401-709-5015
Sara.bloom@usdoj.gov

Date:   February 10, 2025

### Certificate of Service

I hereby certify that on this 10th day of February, 2025, I caused this document to be filed electronically and thus to be available for viewing and downloading from the ECF system.

By:  */s/ Sara Miron Bloom*
SARA MIRON BLOOM
Assistant United States Attorney